UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MORGAN HENDERSON,<br><br>  Plaintiff,<br><br>  v.<br><br>LINCOLN SQUARE, LLC, et al.,<br><br>  Defendants. | Case No. C-12-1938 JCS<br><br>**ORDER DENYING PLAINTIFF'S RENEWED MOTION FOR A FINDING OF CONTEMPT AND AWARD OF SANCTIONS**<br><br>Re: Docket No. 38 |

## I. INTRODUCTION

Plaintiff brought this action under the Americans with Disabilities Act of 1990 ("ADA") and state civil rights laws based on alleged architectural barriers at the Lincoln Square Shopping Center, in Oakland California. The parties entered into a settlement agreement under which Lincoln Square, LLC ("Lincoln Square") agreed to make certain modifications. Pursuant to the settlement agreement and the stipulation of the parties, the Court dismissed the action with prejudice but retained jurisdiction to enforce the settlement agreement. *See* Docket No. 30. Previously, Plaintiff brought a motion seeking contempt sanctions for failure to timely complete the remedial work agreed to under the Settlement Agreement, which the Court denied without prejudice on the basis that the parties had not adequately met and conferred with Lincoln Square prior to bringing the motion. Presently before the Court is Plaintiff's Renewed Motion Requesting a Finding Against Defendant Lincoln Square, LLC of Contempt of Court and for Sanctions ("Renewed Motion"). A hearing on the Renewed Motion was held on Friday, April 24, 2015 at 9:30 a.m. For the reasons stated below, the Renewed Motion is DENIED.[1]

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Relevant Terms of the Settlement Agreement

Under the Settlement Agreement, Lincoln Square agreed, *inter alia*, to install a pedestrian ramp from the lower level to the upper level, a new walkway along the lower level and disabled-accessible parking spaces on the lower level. Docket No. 29 (Settlement Agreement), Attachment A. The work was to be completed "within twelve months of full execution of the Agreement," that is, by June 11, 2014. *Id*. at 2, 7-8. However, the Settlement Agreement further provided that if there was delay due to "circumstances beyond [Lincoln Square's] control," the parties would meet and confer to either agree to a new schedule or, if the parties could not agree, bring the matter to the Court for resolution. *Id*. at 2-3. "Circumstances beyond [Lincoln Square's] control" included, but was not limited to "the time needed for governmental approval)(s) (e.g. permits), weather, and the contractor's availability." *Id*. at 3.

### B. Compliance Efforts

In the joint status report filed by the parties on April 10, 2015, Lincoln Square represented that all of the work agreed to under the Settlement Agreement is close to completion and will likely be complete by May 15, 2015; the pedestrian ramp was projected to be completed on April 13, 2015. Docket No. 44. Lincoln Square attributes the delay in completion of the project of almost a year to a series of difficulties that were beyond its control and asserts that it has diligently sought to complete the project since the parties entered into the Settlement Agreement. The history of the project is briefly summarized below.

First, at the outset of the project, Lincoln Square had difficulty retaining a contractor. *See* Clark Decl., Docket No. 34-1 ("First Clark Decl."). The contractor who had worked with Lincoln Square during the litigation significantly increased an earlier estimate and then, after Lincoln Square decided to retain that contractor despite the cost, told Lincoln Square it could not perform the work. *Id*. Consequently, Lincoln Square was not able to retain a contractor for the project until August 2013.

Once the contractor was found, Lincoln Square hired an ADA compliance consulting firm to complete a project design and drawings. *Id*. The design had to be cleared with the new owners

of Lincoln Square as well.[2]  The design and plans were completed and a permit application was submitted to the City of Oakland ("City") on February 11, 2014.  *Id*.  According to Lincoln Square, it believed at that point that it would be able to complete the project by the agreed-upon deadline.  *Id*.

Lincoln Square did not receive a response from the City until March 11, 2014.  The comments included "numerous additional requirements, including a requirement for engineered drawings."  *Id*.  Lincoln Square therefore retained an engineer and new engineered plans were submitted to the City on April 7, 2014.  *Id*.  The City asked for significant additional information, as well as revisions, and at one point, the City official who was reviewing the project was out of the office for approximately a week to 10 days.  *Id*.  Ultimately, the permit was issued on July 17, 2014.  The work began in August, when the contractor first became available.  *Id*.

Once work began and the contractor broke ground, a buried building footing was discovered, requiring that the ramp be moved.  *Id*.  Lincoln Square submitted revised drawings to the City on September 1, 2014;  the revision was not approved until September 25, 2014.  *Id.*  In addition, moving the ramp required relocating a water meter, which could only be done by the East Bay Municipal Utility District ("East Bay MUD").  *Id*.  East Bay MUD began the work on November 3, 2014 and completed the work on November 11, 2014.  *Id*.  Excavation also revealed that water lines needed to be lowered and/or replaced.  *Id*.  That work was also completed on November 11, 2014.  *Id*.

From mid-November until January 2, 2015, construction was halted to minimize disruption during the holiday shopping season.  *Id*.  Although Lincoln Square had negotiated an agreement with the new owner to allow construction to continue on the ramp, as that area was already fenced off, tenants objected and threatened litigation if any construction occurred during that period.  *Id*.

Starting January 2, 2015 the construction moved forward.  Clark Decl., Docket No. 40-1 ("Second Clark Decl.").  The project was divided into three phases:  1) construction of the ramp

---

[2] After the parties entered into the Settlement Agreement Lincoln Square, LLC sold the property to Property Development Centers, LLC, but Lincoln Square retained the obligation to perform the remedial work required under the Settlement Agreement.  *Id*.

3

1  between the lower level and the upper level of the shopping center; 2) construction of a new
2  walkway and landing along the upper level of the shopping center; and 3) a new walkway along
3  the lower level of the shopping center, parking improvements and curb cuts.  *Id*.  Lincoln Square
4  arranged for these phases to overlap to accelerate construction.  *Id*.  As of late January 2015, the
5  upper level walkway had been completed.  *See* Smith Decl., Docket No. 40-2.  However,
6  unforeseen difficulties arose in connection with the lower level walkway.  In particular, during the
7  initial demolition for the lower level walkway, it was found that the supports for the upper level
8  stores were not tied to sufficient footings in the lower level walkway.  *Id*.  Until this problem was
9  resolved, the demolition for the lower level walkway could not proceed.  *Id*.

10  Lincoln Square's engineers did not have the expertise to design the replacement footings,
11  so it was required to retain structural engineers to design the new footings for the support posts.
12  *Id*.  The design for the new footings was approved by the City of Oakland on February 23, 2015.
13  *Id*.  On March 5, 2015, however, the City informed Lincoln Square that it would need a building
14  permit before it could proceed with work on the support posts.  *See* Docket No. 44. According to
15  Lincoln Square, "[t]he City required that [the] building permit application include the total area of
16  the work to be completed, the square footage of the concrete sidewalk to be removed and replaced,
17  and certification from Lincoln Square's engineer that the previously-approved footing can apply to
18  each of the six posts."  *Id*.  Lincoln Square submitted the application and obtained the building
19  permit on March 23, 2015.  *Id*.  It is now in the process of installing the new footings.  *Id*.  This
20  process involves two City inspections and time to allow the poured cement to cure (according to
21  the City inspector, between 7 and 21 days);  it cannot be completed on all six posts
22  simultaneously, and the walkway cannot be built until the shoring is removed from the six new
23  posts. *Id*.

24  The difficulties with the footings has also delayed the completion of the accessible parking
25  and curb cuts, which were to be located in an area that overlapped with the lower level walkway.
26  As the walkway had to be replaced and regraded, the curb cuts and accessible parking could not be
27  completed until the lower level walkway was completed.  Smith Decl.

28  At the Motion hearing, Lincoln Square's counsel represented that the ramp was complete

4

and that the shorings had been removed from all of the posts; he again projected that the entire project would be complete by May 15, 2015.

## III. ANALYSIS

### A. Legal Standard on Contempt

In a civil contempt proceeding, "[t]he moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999). The court may exercise its civil contempt power for one or both of two purposes: "to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303-304 (1947). A party may be held in contempt even if its conduct was not willful. *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1156, 1130 (9th Cir. 2006) (citations omitted). There is no good faith exception to the requirement of obedience to a court order. *Go-Video v. Motion Picture Ass'n of America*, 10 F.3d 693, 695 (9th Cir. 1993). However, substantial compliance is a defense to an action for civil contempt. *Balla v. Idahoe State Board of Corrections*, 869 F.2d 461,466 (9th Cir. 1989). Thus, once it has been demonstrated that a party has violated a specific and definite court order, the burden shifts to the party sought to be held in contempt to prove that it "took all reasonable steps within [its] power to insure compliance." *Hook v. Arizona Dep't of Corrections*, 107 F.3d 1397 (9th Cir. 1997) (citing *Sekaquaptewa v. MacDonald*, 544 F.2d 396, 403-404 (9th Cir. 1976)). Where a party has taken all reasonable steps to comply, technical or inadvertent violations of the order will not support a finding of civil contempt. *General Signal Corp. v. Donallco, Inc.*, 787 F.2d at 1379.

### B. Discussion

In the Renewed Motion, Plaintiff's primary basis for asking the Court to find Lincoln Square in contempt is its failure to provide disabled parking and curb cuts well after the 12-month deadline for completing the remedial work has passed. Renewed Motion at 2-3. It is Plaintiff's position that Lincoln Square should have installed temporary parking and curb cuts while the other construction was being completed, as was suggested by Plaintiff's counsel to Lincoln Square's

counsel.[3]  The Court concludes that Lincoln Park's failure to install temporary parking and curb cuts does not support a finding of contempt.

First, assuming violation of the terms of the Settlement Agreement amounts to a violation of the Court's order dismissing the case (an issue the Court need not decide), Plaintiff has not offered clear and convincing evidence of a violation.  Although the Settlement Agreement set a twelve-month deadline for completion, it also provided the parties would meet and confer where circumstances outside of Lincoln Square's control resulted in delay, thus implicitly recognizing that Lincoln Square might not be able to meet that deadline.  The record shows that Lincoln Square encountered a series of circumstances outside of its control, including not only difficulty scheduling contractors and delays associated with obtaining governmental approvals (which were expressly referenced in the Settlement Agreement as the types of delays that would constitute circumstances outside of Lincoln Square's control) but also the discovery of major structural issues that vastly broadened the scope of the project as compared to what was originally envisioned.  It also reflects that from the outset, Lincoln Square's counsel has informed Plaintiff's counsel of the reasons for the delays and provided extensive supporting documentation to Plaintiff's counsel regarding the progress of the project.

Second, there is nothing in the Settlement Agreement that required Lincoln Square to install temporary curb cuts and disabled parking in an area that was going to have to be regarded to complete other required modifications.  Thus, failure to do so does not demonstrate a violation of the Settlement Agreement.  This point is highlighted by the fact that Plaintiff's counsel did not even suggest that this should be done until February 2015.  Nor does counsel offer any specific design plans or evidence showing that such a plan would have been safe or feasible.  In any event, Lincoln Square's apparent rejection of this suggestion is not sufficient to justify a finding of contempt.

Finally, even if the Court were to find that Lincoln Square violated the terms of the Settlement Agreement by failing to install temporary disabled parking and curb cuts, Lincoln

---

[3] It appears that this possibility was first raised by Plaintiff's counsel on February 13, 2015, in a conversation between Mr. Rein and defense counsel Nate Smith.  *See* Smith Decl., ¶ 12.

1  Square has presented evidence that it substantially complied with the terms of the Settlement
2  Agreement.
3  **IV.     CONCLUSION**
4      For the reasons stated above, the Renewed Motion is DENIED. A Case Management
5  Conference to address the status of the project is set for  May 15, 2015 at 2:00 p.m.

7  Dated:  April 24, 2015

                                                Joseph C. Spero
                                                Chief  Magistrate Judge